UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PAUL M.,[1] | ) |
|     Plaintiff, | ) No. 19 CV 4581 |
| v. | ) Magistrate Judge Young B. Kim |
| ANDREW M. SAUL, Commissioner of the Social Security Administration, | ) |
|     Defendant. | ) March 2, 2021 |

**MEMORANDUM OPINION and ORDER**

Paul M. ("Paul") seeks disability insurance benefits ("DIB") and supplemental security income ("SSI"), claiming that he suffers from degenerative joint disease of the bilateral knees and left shoulder, diabetes, asthma, sleep apnea, and obesity, which prevent him from engaging in full-time work. Before the court are the parties' cross motions for summary judgment. For the following reasons, Paul's motion is denied, and the government's is granted:

**Procedural History**

Paul filed his DIB application in December 2016 and his SSI application in April 2017, alleging disability beginning on August 28, 2014. (Administrative Record ("A.R.") 16, 172-84.) The government denied his applications initially and on request for reconsideration. (Id. at 16, 71-84, 86-98.) Paul requested and received a hearing before an administrative law judge ("ALJ"), (id. at 114-30), and in March

---

[1] Pursuant to Internal Operating Procedure 22, the court uses only the first name and last initial of Plaintiff in this opinion to protect his privacy to the extent possible.

2018, Paul appeared at the hearing with his attorney and a vocational expert ("VE"), (id. at 35-70). In June 2018 the ALJ issued a partially favorable decision, finding that Paul was not disabled from August 28, 2014 (his alleged disability onset date) through October 25, 2015, but that he became disabled on October 26, 2015, the day before he turned 50 years old. (Id. at 16-28.) When the Appeals Council declined review, (id. at 1-6), the ALJ's decision became the final decision of the Commissioner, *see Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019). Paul then filed this lawsuit seeking judicial review, and the parties consented to the court's jurisdiction. *See* 28 U.S.C. § 636(c); (R. 8).

## Facts

Paul graduated from high school and worked as a forklift operator and loader for more than 20 years. (A.R. 41-45, 250.) On August 28, 2014, he slipped on a patch of oil on the floor and fell, causing his left leg to shoot out in front of him and his body to land "bluntly" on his right knee. (Id. at 1036.) As a result of the fall, Paul fractured his right knee and tore his left hamstring. (Id. at 44-45, 62, 342, 363-66, 1036.) He underwent a right-knee replacement surgery in June 2015. (Id. at 49-50, 641-43.) He says he is unable to work because of pain and swelling in his legs, diabetic neuropathy in his feet, numbness and pain in his hands, and anxiety and depression. (Id. at 47-53, 61-62.) He has lived in the basement of his sister's home for 18 years. (Id. at 45.)

2

**A.     Medical Evidence**

Paul's medical records show that at the time of his alleged disability onset date, his primary impairments were degenerative joint disease of the bilateral knees and left shoulder, diabetes mellitus, asthma, obstructive sleep apnea, and obesity. (A.R. 1072-77, 1099-1104, 1108, 1140, 1606.) He injured his left leg and right knee at work on August 28, 2014. (Id. at 342, 363-66, 443.) Paul has a history of obesity, weighing 367 pounds and measuring about 67 inches, with a body mass index of 57.48, as of September 2014. (Id. at 19, 359; see also id. at 379, 1072-73.) He also has a history of anxiety and depression. (Id. at 19, 379, 1113-14.)

An orthopedist evaluated Paul in October 2014 and recommended that Paul start physical therapy. (Id. at 1036-37.) Between that time and March 2015, Paul attended more than 50 physical therapy sessions. (Id. at 679-779; see also id. at 1013 (November 2014 physical therapy notes indicate Paul was functioning at sedentary physical level), 1016 (October 2014 physical therapy notes indicate same).) He stopped physical therapy in March 2015 because of "plateaued progress," but was functioning at the light physical level and was able to carry 20 pounds for 100 feet. (Id. at 679.)

Shortly thereafter, Paul's orthopedist recommended a right-knee replacement surgery. (Id. at 1021.) In June 2015 Paul underwent a right cemented total knee arthroplasty. (Id. at 425-30.) After the surgery, Paul attended about 30 more sessions of physical therapy through October 5, 2015. (Id. at 792-863; see also id. at 997 (August 2015 physical therapy notes indicate Paul was functioning at sedentary

3

physical level), 988, 1000 (November 2015 physical therapy notes indicate Paul was functioning at medium physical level), 1001, 1002 (October 2015 physical therapy notes indicate Paul was functioning at light physical level).

## B.     Paul's Hearing Testimony

Paul testified at the hearing that he stopped working on August 28, 2014, the day that he suffered his on-the-job injury to his leg and knee. (A.R. 43-45.) Since his injury Paul has had difficulty walking, which—along with cool, damp weather—triggers pain to his leg, knee, shoulder, and hand. (Id. at 49-50, 58.) After his knee replacement, Paul used a walker and then a cane, although he said the cane "just gets in the way." (Id. at 56, 59.)

Paul is able to drive for about 45 minutes, but he has difficulty getting out of his car because of pain and swelling in his legs and feet. (Id. at 47-48.) Paul does not leave his basement room often because he has difficulty using the stairs. (Id. at 54-55.) He is able to microwave or cook food and launder his clothes. (Id. at 55.) If he goes to the store, he holds on to a cart for stability and sits down if he gets tired. (Id. at 56.) He suffers from depression and anxiety, for which he takes medication. (Id. at 52.)

## C.     VE's Hearing Testimony

A VE also testified at the hearing. She described Paul's prior work as material handler, which is designated as heavy work under the Dictionary of Occupational Titles ("DOT"). (A.R. 63.) The ALJ posed a series of hypothetical questions to the VE regarding whether someone with a specific hypothetical

4

residual functional capacity ("RFC") could perform Paul's past work. (Id. at 64.) In response to a hypothetical positing an individual with an RFC for light work with limitations, including occasional climbing, balancing, and stooping, no kneeling, crouching, or crawling, no concentrated exposure to dust, fumes, gases, or poor ventilation, and occasional overhead reaching, the VE testified that such a person could not perform Paul's past work but could perform other occupations, such as routing clerk, furniture rental consultant, and counter clerk. (Id. at 64-65.)

In response to a different hypothetical—involving an individual with an RFC for sedentary work with the same limitations—the VE testified that such a person could perform jobs such as microfilm document preparer, assembler, and order clerk. (Id. at 65-66.) The VE also explained that the hypothetical individual could not be off task for more than 10 percent of a workday or miss more than six to eight workdays per year. (Id. at 68.)

### D. The ALJ's Decision

The ALJ followed the required five-step process in evaluating Paul's disability claims. *See* 20 C.F.R. § 404.1520(a). At step one the ALJ found that Paul had not engaged in substantial gainful activity since his alleged onset date. (A.R. 19.) At step two the ALJ concluded that Paul has the severe impairments of degenerative joint disease of the bilateral knees status post right-sided total knee arthroplasty, degenerative joint disease of the left shoulder, diabetes mellitus, asthma, obstructive sleep apnea, and obesity. (Id.) At step three the ALJ determined that Paul's impairments do not meet or medically equal any listed

5

impairment. (Id. at 20-21.) Before turning to step four, the ALJ assessed Paul as having an RFC to perform sedentary work with limitations that he: can perform occasional climbing, balancing, and stooping; can never kneel, crouch, or crawl; can have no concentrated exposure to dusts, fumes, gases, or poor ventilation; and can occasionally reach overhead with the bilateral upper extremities. (Id. at 21.) At step four the ALJ found that Paul has been unable to perform his past relevant work, but at step five the ALJ determined that before October 26, 2015, Paul could perform a significant number of jobs in the national economy, but not after that date. (Id. at 26-27.) Accordingly, the ALJ found Paul disabled only since October 26, 2015. (Id.)

## Analysis

Paul argues that the ALJ erred when evaluating the medical opinion evidence, in assessing his RFC, and by failing to satisfy her burden at step five to show that significant jobs existed in the national economy that Paul could perform. (R. 16, Pl.'s Mem. at 5-6.) The court reviews the ALJ's decision only to ensure that it is based on the correct legal criteria and supported by substantial evidence. *Prater v. Saul*, 947 F.3d 479, 481 (7th Cir. 2020). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation marks and citation omitted). The ALJ is required to "build an accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th

Cir. 2014). But this court is "not free to replace the ALJ's estimate of the medical evidence" with its own, *see Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), and must uphold the decision even where "reasonable minds can differ over whether [the claimant] is disabled," *see Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

## A.  Opinion Evidence

Paul argues that the ALJ erred in rejecting opinions from his treating providers that he was unable to return to work. (R. 16, Pl.'s Mem. at 6-9.) When weighing medical opinions, an ALJ "must consider the entire record, including all relevant medical and nonmedical evidence," and adequately explain how she weighed an opinion in light of the record. *Murphy v. Astrue*, 454 Fed. Appx. 514, 518 (7th Cir. 2012) (internal quotations and citations omitted). A treating source's opinion is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence."[2] *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (quotation and citation omitted).

Paul asserts that the ALJ improperly weighed 2014 and 2015 opinions rendered by his treating orthopedist, Dr. Charles Bush-Joseph, and treating physician assistant, Travis Smith, indicating that he was not able to return to work

---

[2] On January 18, 2017, new regulations issued, eliminating the treating physician rule for claims filed after March 27, 2017. *See* 20 C.F.R. § 404.1520(c). Paul filed his DIB and SSI claims on December 5, 2016, and April 17, 2017, respectively. (A.R. 16.) Although only the DIB application was filed before the effective date, the government assumes for purposes of this case that the treating-physician rule applies here because the ALJ adjudicated the DIB and SSI applications together. (R. 25, Govt.'s Mem. at 3 n.4.)

7

after he sustained an injury to his left leg and right knee in August 2014. (R. 16, Pl.'s Mem. at 6-9.) For support Paul points to the single paragraph in the ALJ's decision devoted to assigning weight to these opinions. (Id.) In this particular paragraph, the ALJ explained that the treating providers' opinions that Paul is unable to work impinged upon an issue—whether Paul is in fact disabled or able to work—reserved for the Commissioner. (A.R. 24-25.) Because the ALJ found that the providers "act[ed] beyond their purview," she assigned these opinions no weight. (Id. at 25.) Insofar as the providers also opined that Paul could perform sedentary work, the ALJ accorded some weight to these opinions, but noted that additional limitations were warranted. (Id.)

If separated from the rest of her decision, the ALJ's opinion evaluation appears to lack the support of substantial evidence. However, the court must consider the entire decision as a whole and not just a specific portion of the decision. In other parts of her decision, the ALJ addressed Dr. Bush-Joseph's treating relationship with Paul as well as objective medical evidence, including Dr. Bush-Joseph's treatment records. (Id. at 23.) The ALJ considered the length and nature of Dr. Bush-Joseph's relationship with Paul, citing treatment records from October 7, 2014, through March 13, 2015, and noting his specialty as an orthopedist. (Id. at 23 (citing id. at 1021, 1036-37).) In so doing, the ALJ explained how that evidence supported her determination that Paul was capable of performing sedentary work, consistent with Dr. Bush-Joseph's and Smith's opinions to that effect and contrary to their opinions that he was unable to return to work. (Id. at 23-25.)

8

The ALJ then discussed Dr. Bush-Joseph's treatment records. The ALJ noted that at Paul's first visit in October 2014, Dr. Bush-Joseph reviewed the MRI taken on September 17, 2014, and found a traumatic left proximal hamstring rupture and right-knee contusion with preexisting severe osteoarthritis and valgus deformity. (Id. (citing id. at 1036-37).) However, at this same appointment, Dr. Bush-Joseph recommended a six-week course of physical therapy, which he believed would improve Paul's leg and knee impairments. (Id.) At subsequent appointments in October and November 2014, Paul reported a "drastic improvement with physical therapy" and Dr. Bush-Joseph commented that, "overall I feel [Paul] is doing quite well." (Id. (citing id. at 1030, 1033) (internal quotations omitted).) In December 2014 the orthopedist observed "mild" patellofemoral crepitation, for which he prescribed a knee brace. (Id. (citing id. at 1027) (internal quotations omitted).)

The ALJ also pointed out that by January 30, 2015, despite Paul's reports of left hamstring and right knee pain, Dr. Bush-Joseph recorded that Paul was "clearly capable of working in a sedentary fashion." (Id. (citing id. at 1024) (internal quotations omitted).) By March 12, 2015, Paul had been discharged from physical therapy and was able to carry 20 pounds for 100 feet. (Id. (citing id. at 679).) Nevertheless, the following day Paul reported significant discomfort to Dr. Bush-Joseph, and the orthopedist recommended a total right-knee replacement surgery. (Id. (citing id. at 1021).) Dr. Scott Sporer, who works in the same clinic as Dr. Bush-Joseph, performed the replacement surgery in June 2015. (Id.)

9

The ALJ also discussed other objective evidence supporting her determination. The ALJ noted that while Paul used a walker during a follow-up appointment with Dr. Sporer in July 2015, Paul had improved range of motion and no unusual pain. (Id.) The ALJ further observed that when Paul resumed physical therapy after the surgery, his therapist consistently recorded improved strength and mobility and no need for an assistive device when walking. (Id.) Similarly, Paul's primary care physician observed normal range of motion and neurologic function without any acute distress. (Id.)

In September 2015 Paul's rehabilitation specialist reported that Paul was functioning at a sedentary level. (Id.) The ALJ noted that the following month Dr. Sporer found on examination that Paul had diminished right knee motion of only three degrees and mild swelling. (Id.) During a November 2015 functional capacity evaluation, the examiner observed Paul walking with an abnormal gait but also found that he could lift and carry more than 10 pounds. (Id.) Based on the evidence of record, the ALJ found that despite Paul's need for a knee replacement and reduced knee mobility, he did not present for examinations in acute distress but rather showed "good strength and sensation, normal breathing sounds, and an independent gait, without any mention of diminished grip strength or unusual fatigue." (Id. at 24.)

Against this backdrop, the ALJ considered Dr. Bush-Joseph's and Smith's opinions regarding Paul's ability to work. At times during the applicable period the providers opined that Paul could not return to work. (Id. at 24-25 (citing id. at 1023

10

(March 13, 2015 work status report by Dr. Bush-Joseph noting that Paul is "unable to work"), 1035 (October 21, 2014 work status report by Smith noting that Paul "may not return to work at this time" but that Paul would be reevaluated in four weeks, and Smith anticipated a "modified return to work"), 1038 (October 7, 2014 work status report by Dr. Bush-Joseph noting that Paul "may not return to work" but that he would be reevaluated in two weeks)).) At other times they opined that Paul was limited to sedentary work. (Id. (citing id. at 1026 (January 30, 2015 work status report by Smith noting that Paul may perform sedentary work), 1029 (December 16, 2014 work status report by Smith noting same), 1032 (November 18, 2014 work status report by Smith noting same).) The ALJ rejected Dr. Bush-Joseph's and Smith's opinions that Paul was unable to work[3] but granted some weight to their opinions that Paul was capable of performing sedentary work. In so ruling, the ALJ explained that whether Paul is disabled to work is a matter for the Commissioner, not a medical provider, to decide. (Id. at 25.) She also found the

---

[3] Although in some cases Paul's treating providers noted that Paul was "unable to work," (see, e.g., A.R. 1023, 1060), at other times they noted that he needed to "remain off work" or that he could "not return to work at this time" but that he would be reevaluated in a few weeks, (see id. at 1035, 1038). The providers' work statements suggest that Paul was not able to return to work in his capacity as a forklift operator or loader, which was classified as heavy work under the DOT, (id. at 63), not that Paul was unable to work in any position. Viewing the providers' opinions in this light helps explain why at times they opined that Paul was capable of sedentary work and of meeting certain demands, such as "[l]ifting 10 pounds maximum and occasionally lifting and/or carrying such articles as dockets, ledgers and small tools." (Id. at 1026, 1029, 1032.) But because the ALJ did not draw this inference from the records—and the government did not argue this point—the court will not do so either.

medical opinions allowing sedentary work, along with additional limitations, to be more in line with "the objective medical evidence and the course of treatment." (Id.)

Paul asserts that the ALJ failed to provide good reasons for rejecting Dr. Bush-Joseph's and Smith's opinions that he was unable to work. (R. 16, Pl.'s Mem. at 6-9.) He challenges the ALJ's determination that Dr. Bush-Joseph and Smith were "acting beyond their purview" by opining as to Paul's ability to work. (Id. at 6 (citing id. at 24-25) (internal quotations omitted).) The Seventh Circuit has explained that although the "legal question whether a claimant qualifies for benefits is reserved," when determining a claimant's functioning an ALJ "must consider a treating physician's view that the severity of a claimant's impairments makes her unable to work." *Knapp v. Berryhill*, 741 Fed. Appx. 324, 327 (7th Cir. 2018) (citing 20 C.F.R. § 404.1527(e)(1)). Given such authority, the ALJ could not simply dismiss Dr. Bush-Joseph's and Smith's findings that the severity of Paul's leg and knee impairments renders him unable to work. But that is not what happened in this case. Here the ALJ did not decline to grapple with the evidence. Instead, she considered the objective medical evidence, including Dr. Bush-Joseph's treatment records, and determined that Paul was capable of performing sedentary work, consistent with Dr. Bush-Joseph's and Smith's opinions finding the same. (A.R. 23-25.) Where, as here, the ALJ minimally articulated her reasons for weighing Dr. Bush-Joseph's and Smith's opinions, and those reasons amounted to substantial evidence for her conclusions, the court finds no error. *See Elder*, 529 F.3d at 415.

Paul also suggests in his opening brief that the ALJ erred in rejecting Dr. Sporer's and physician assistant April Penkala's opinions that Paul was unable to return to work. (R. 16, Pl.'s Mem. at 6.) But he fails to develop this argument in his opening brief, and as such has waived this argument, as the government correctly notes. (R. 25, Govt.'s Mem. at 2 n.2); *see also Vang v. Saul*, 805 Fed. Appx. 398, 403 (7th Cir. 2020) ("Perfunctory and undeveloped arguments are waived." (internal quotations and citation omitted)). Paul explains in his reply that the ALJ only explicitly addressed opinions from Dr. Bush-Joseph, Smith, and Dr. Sporer. (R. 26, Pl.'s Reply at 5.) Paul represents that Dr. Sporer and Penkala practiced at Midwest Orthopaedics with Dr. Bush-Joseph and Smith, and that Dr. Sporer's and Penkala's treatment records and work status reports are "substantially similar" to those of Dr. Bush-Joseph and Smith. (Id.) Based upon this alleged similarity, and the alleged fact that the ALJ "implicitly rejected" Dr. Sporer's and Penkala's opinions "for the same reason," Paul suggests that he was not required to develop any argument as to their opinions in his opening brief. (Id. at 5-6.) The court disagrees. Paul could have developed this argument earlier but did not, and he cites no authority to support the belated development of such argument. Paul therefore has waived any challenge to the evaluation of Dr. Sporer's and Penkala's opinions. *See Vang*, 805 Fed. Appx. at 403.

In his reply Paul also raises for the first time the ALJ's evaluation of the state agency physicians' opinions. (R. 26, Pl.'s Reply at 6.) The ALJ assigned little weight to their opinions that Paul was capable of performing medium work with

13

frequent climbing, stooping, kneeling, crouching, and crawling. (A.R. 24.) According to the ALJ, their assessment was "inconsistent with the record as a whole." (Id.) Because Paul did not raise or develop this issue in his opening brief, he cannot raise it for the first time in a reply brief. *See Wonsey v. City of Chi.*, 940 F.3d 394, 398 (7th Cir. 2019) ("[A]rguments raised for the first time in a reply brief are waived."). Accordingly, the court finds no error in the ALJ's medical opinion evaluation.

**B. RFC Assessment**

Paul argues that the ALJ erred in assessing his RFC by failing to account for his need for frequent treatment in the period preceding October 26, 2015. (R. 16, Pl.'s Mem. at 9-10.) Specifically, Paul contends that the ALJ was required to consider how his 89 physical therapy sessions, three-day hospitalization for his knee replacement surgery, and other appointments interfered with his ability to sustain full-time, competitive work during the applicable period. (Id.) The government counters that Paul's argument amounts, at best, to speculation and lacks the support of legal authority. (R. 25, Govt.'s Mem. at 8-10.) The government points out that Paul bears the burden of showing that his impairments rendered him unable to work for a continuous period of at least 12 months, and that he never established that physical therapy or other appointments interfered with his ability to do so here. (Id.)

Notably, Paul does not contend that the ALJ failed to address his courses of physical therapy or knee replacement surgery. Nor could he, as the ALJ cited

14

treatment records discussing both. (A.R. 23.) What Paul essentially argues here is that his regular attendance at physical therapy sessions, combined with time spent in the hospital for knee surgery, add up to more than the six to eight unexcused absences from work that an employer would tolerate, as the VE explained at the hearing. (R. 16, Pl.'s Mem. at 9-10.) But as the government points out, Paul never establishes that he could only attend physical therapy during work hours, or that he would need to miss full days to attend such sessions. He cites no authority showing that a need to attend regular physical therapy sessions can render a claimant disabled. And he does not address a Seventh Circuit case rejecting a similar argument, *Best v. Berryhill*, 730 Fed. Appx. 380 (7th Cir. 2018), which the government cites in its motion, (R. 25, Govt.'s Mem. at 9). In *Best* the court deemed "frivolous" a claimant's argument that doctors' appointments would preclude him from working because he could not "point to anything in the record to suggest that his appointments would require him to miss a full day of work or that he could not schedule his appointments outside of working hours." 730 Fed. Appx. at 382.

In any event, the ALJ pointed to opinions from Paul's treatment providers indicating that he was capable of performing sedentary work at various points before his knee replacement surgery in June 2015. A.R. 24-25 (citing id. at 1026 (January 30, 2015 report noting that Paul may perform sedentary work), 1029 (December 16, 2014 report noting same), 1032 (November 18, 2014 report noting same).) The ALJ also cited Paul's own physical therapy notes, which stated that by September 2015 he was capable of sedentary work. (Id. at 23 (citing id. at 870

15

(noting that Paul entered work conditioning program at sedentary physical demand level)).) Given this evidence, the ALJ reasonably concluded that her assessed RFC was supported by the objective medical record and course of treatment. (Id. at 25.)

**C.    Step-Five Determination**

Paul argues that the VE's testimony does not support the ALJ's step-five determination that there is sufficient work available to him given the assigned RFC. (R. 16, Pl.'s Mem. at 10-11.) Before relying on a VE's testimony at step five, the ALJ must ensure that substantial evidence supports the VE's testimony that "suitable jobs exist in significant numbers." *Chavez v. Berryhill*, 895 F.3d 962, 963 (7th Cir. 2018). Here the VE testified that a hypothetical worker of Paul's age and RFC could not perform past relevant work but that there are other jobs in the national economy that he could perform, including microfilm document preparer (47,042 jobs), assembler (9,571 jobs), and order clerk (3,694 jobs). (A.R. 26, 65-66.) In her decision the ALJ stated that she considered and accepted the VE's testimony in determining that Paul "is capable of making a successful adjustment to other work that exist[s] in significant numbers in the national economy." (Id. at 27.)

Paul argues that the ALJ failed to show that a significant number of jobs that he can perform are available. (R. 16, Pl.'s Mem. at 10.) The court disagrees. In her testimony, the VE identified 60,307 available jobs. (A.R. 26, 65-66.) The VE answered "cogently and thoroughly" the questions posed by the ALJ and Paul's attorney. *See Biestek*, 139 S. Ct. at 1155. The VE also confirmed that her testimony was consistent with both the DOT and the companion publication Selected

16

Characteristics of Occupations. (A.R. 66.) During the hearing Paul's attorney asked no questions relating to, and made no objection to, the sufficiency of the number of jobs identified by the VE. As such, the ALJ was entitled to rely on the VE's testimony in finding that jobs that Paul could perform existed in significant numbers in the national economy. *See Biestek,* 139 S. Ct. at 1155.

## Conclusion

For the foregoing reasons, Paul's motion is denied, and the government's is granted. The Commissioner's final decision is affirmed.

**ENTER:**

**Young B. Kim**
**United States Magistrate Judge**